**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DIAMOND PUGH** and **STACEY TORRES**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**IDSCAN.NET, INC., THE HERTZ CORPORATION, and PLANET 13 HOLDINGS, INC.**,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiffs Diamond Pugh and Stacey Torres ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Class Members," as defined below), by and through their undersigned counsel, file this Class Action Complaint against IDScan.net, Inc. ("IDScan), The Hertz Corporation ("Hertz"), and Planet 13 Holdings, Inc. ("Planet 13") (collectively, "Defendants") and allege the following based on personal knowledge of facts, upon information and belief, and based on the investigation of their counsel as to all other matters.

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit against Defendants for their negligent failure to protect and safeguard Plaintiffs' and Class Members' highly sensitive personally identifiable information ("PII" or "Private Information"), culminating in a massive and preventable data breach (the "Data Breach" or "Breach"). As a result of Defendants' failure to implement reasonable and necessary data security practices, cybercriminals easily infiltrated IDScan's inadequately protected computer systems and stole Private Information of Plaintiffs and Class Members.

2. IDScan is an identity verification and ID scanning technology company based in New Orleans, Louisiana, that helps businesses authenticate documents, verify age, and prevent fraud. The organizations that IDScan services are hereinafter referred to as "IDScan's Clients" or "Clients." Upon information and belief, Hertz, and Planet 13 contracted with IDScan for the provision of identity verification services as part of their business practices.

3. As part of Defendants' business practices and to provide services or products, Defendant IDScan collects, stores, and maintains customers' PII, including Plaintiffs' and Class Members'. Plaintiffs and Class Members are current and former customers of IDScan's Clients.

4. Upon information and belief, IDScan experienced unauthorized access to its IT Network that resulted in more than 153 million driver's license scans, over 10 million scans of other government-issued identification and travel documents—including state identification cards, international travel cards, and medical and marijuana-dispensary cards— as well as front- and back-side images and infrared and ultraviolet scans of such documents, that Plaintiffs and Class Members entrusted to IDScan's Clients, including Hertz, Casino Resorts, and Planet 13, either directly or indirectly, and are now on the Dark Web for sale on a new service called "Nexus."[1]

5. Nexus claims that it has been collecting these driver's license and other ID scans for over a year and that "[r]ecords are available to preview before purchase with pertinent information redacted. Customer photos are displayed if available."[2]

6. Upon information and belief, to date, Defendants have failed to individually notify the victims of the Data Breach that their Private Information was compromised. Thus, most, if not

---

[1] https://www.malwarebytes.com/blog/news/2026/09/dark-web-site-puts-153-milliondrivers-licenses-and-millions-more-ids-up-for-sale (last visited September 21, 2026).

[2] https://krebsonsecurity.com/2026/09/fbi-probes-service-selling-153m-drivers-licenses/ (last visited September 21, 2026).

all Class Members are unaware that their Private Information has been compromised, are unaware of the need to remain vigilant against further misuse of their Private Information, and that they are, and continue to be, at a significant risk of identity theft, fraud, and other forms of harm.

7. Plaintiffs and Class Members provided their Private Information, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard their Private Information from unauthorized disclosure and would implement sufficient cybersecurity safeguards to protect such information.

8. Businesses that store and maintain customers' Private Information, like Defendants, owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from unauthorized disclosures and unauthorized third parties. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons, and especially hackers, will harm the affected individuals, including by the invasion of their private information and financial matters.

9. In providing their Private Information to Defendants, Plaintiffs and the Class Members reasonably expected these sophisticated business entities to keep their Private Information confidential and secured from unauthorized disclosures, to use this Private Information for business purposes only, and to disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information in the Breach.

10. Defendants failed to adequately protect Plaintiffs' and Class Members' Private Information and failed to ensure that they would maintain adequate safeguards to protect their customers' Private Information.

11. Upon information and belief, Plaintiffs' and Class Members' Private Information is in the hands of cybercriminals who will continue to use the stolen Private Information for nefarious purposes for the rest of their lives.

12. Due to Defendants' negligent failure to secure and protect Plaintiffs' and Class Members' Private Information, cybercriminals have stolen and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of thousands of individuals.

13. Now, and for the rest of their lives, Plaintiffs and Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft will have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach.

14. Plaintiffs and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminution of the value of their Private Information, loss of privacy, and additional damages as described below.

15. Plaintiffs bring this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

## II. <u>THE PARTIES</u>

***Plaintiffs***

16. Plaintiff Diamond Pugh is an individual residing in Pitt County, North Carolina who purchased a vehicle from a Hertz dealership, IDScan's Client, this year and provided her driver's license to be collected for verification. Upon information and belief, Plaintiff Pugh is a victim of the Data Breach.

17. Plaintiff Stacey Torres is an individual residing in Clark County, Nevada, who has visited a Planet 13 dispensary, IDScan's Client, multiple times over the past several years and provided her driver's license each time to be collected for verification. Upon information and belief, Plaintiff Torres is a victim of the Data Breach.

***Defendants***

18. Defendant IDScan.net, Inc. is a Delaware corporation with its headquarters and principal place of business located in Orleans Parrish, at 2405 Lakeshore Drive, Suite 526, New Orleans, Louisiana 70122. IDScan's service agent is Andrey Stanovnov, located 2045 Lakeshore Drive, Suite 526, New Orleans, Louisiana 70122.

19. Defendant The Hertz Corporation is a Delaware corporation with its principal place of business in Lee County, at 8501 Williams Road, Estero, Florida 33928. Hertz's service agent is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

20. Defendant Planet 13 Holdings, Inc. is a Nevada corporation with its headquarters and principal place of business located in Clark County, at 2548 W. Desert Inn Road, Las Vegas, Nevada 89109.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000,

exclusive of interest and costs, (2) the action is a class action, (3) numerous Class Members and Plaintiffs are citizens of a different state that is diverse from Defendants, and (4) there are more than 100 Class Members.

22. This Court has personal jurisdiction over Defendant IDScan because its principal place of business is in Louisiana, and the acts and omissions giving rise to Plaintiffs' claims occurred in this State.

23. This Court has personal jurisdiction over Hertz and Planet 13 because they have entered into contracts to conduct substantial business in this District, including with Defendant IDScan. Hertz and Planet 13 have engaged in continuous, systematic, and substantial activities within this State, including substantial transfers of data to IDScan in connection with the Data Breach. Further, a substantial part of the acts and omissions giving rise to Plaintiffs' claims against all Defendants occurred in and emanated from this District.

24. Venue is proper pursuant to 28 U.S.C. § 1391(b) because this is the District in which Defendant IDScan's principal places of business is located, and it is Hertz's and Planet 13's customers which make up the Class of injured individuals bringing this action. Venue is proper under 18 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. Defendants Collected Plaintiffs' and Class Member's Private Information.

25. Defendant IDScan is an identity verification and ID scanning technology company based in New Orleans, Louisiana whose identity verification technology underpins age and identity checks for retailers, bars, and other Fortune 500 clients.

26. Defendant Hertz is a nationwide car rental and used-car sales company operating in more than 2,500 stores across all 50 states and 1,137 cities.

27. Defendant Planet 13 markets itself as the nation's largest dispensary providing cannabis products across locations in Nevada, Illinois and Florida.

28. As part of their business practices and to provide services to Clients, Defendants collect and maintain customers' Private Information, including Plaintiffs' and Class Members', who are current and former customers of Defendants' Clients.

29. Defendants obtain, collect, use, and derive a benefit from the Private Information of Plaintiffs and Class Members. Defendants use the Private Information they collect to provide employment, services and products, and Defendants each make a profit therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of Plaintiffs' and the Class's Private Information.

30. Without collecting and aggregating mass amounts of Private Information, which Defendants know and understand to be sensitive and confidential, Defendants would not be able to engage in their regular business activities.

31. Upon information and belief, Defendants made promises and representations, either directly or indirectly to Plaintiffs and Class Members, that the Private Information that Defendants required to be collected from them would be kept secure and confidential, and that the privacy of that sensitive information would be maintained.

32. Upon information and belief, Defendants promised to, among other things: keep Private Information private; comply with industry standards related to data security and Private Information, including Federal Trade Commission ("FTC") guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information;

only use and release Private Information for reasons that relate to the products and services Plaintiffs and Class Members obtain from Defendants, directly or indirectly, and provide adequate notice to individuals if their Private Information is disclosed without authorization.

33. Plaintiffs and Class Members, who are current and former customers of Defendants, directly or indirectly paid Defendants for services or goods, a portion of which should have been specifically allocated to data security based on Defendants' promises to maintain adequate data security.

34. By collecting, using, maintaining, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known they were obligated to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

35. Defendants were aware of these duties and each stated in their respective, publicly available Privacy policies that reasonable safeguards would be implemented to protect Plaintiffs' and Class Members' Private Information:

**Defendant Hertz:**
"We use reasonable means to safeguard Personal Information under our control. We use reasonable administrative, technical, personnel, and physical measures that are designed to safeguard and ensure the integrity of Personal Information."[3]

**Defendant IDScan:**
"We implement and maintain reasonable administrative, physical, and technical security safeguards to help protect information about you from loss, theft, misuse and unauthorized access, disclosure, alteration, and destruction."[4]

**Defendant Planet 13:**

---

[3] https://www.hertz.com/rentacar/privacypolicy/index.jsp?targetPage=privacyPolicyView.jsp (last accessed September 21, 2026).
[4] https://idscan.net/privacy-policy-2026/ (last accessed September 21, 2026).

"Our Privacy Policy ensures that all of your Personal Information is handled properly with procedures in compliance with all Federal and Provincial requirements. To the best of our ability it will remain confidential and secure."[5]

36. Plaintiffs and Class Members reasonably relied on Defendants' promises to keep their Private Information secure, as Defendants intended.

37. Plaintiffs and Class Members provided their Private Information, directly or indirectly, to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

38. Upon information and belief, Defendants failed to adopt reasonable and appropriate data security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiffs' and the Class's Private Information.

39. As a result of collecting and storing the Private Information of Plaintiffs and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and Class Members' Private Information from disclosure to third parties, and to audit, monitor, and verify the integrity and cybersecurity of its systems storing Private Information.

**B. The Data Breach.**

40. Upon information and belief, Hertz and Planet 13 use IDScan's identity verification services to store Private Information entrusted to them by consumers, including Plaintiffs and Class Members.

---

[5] https://planet13.com/privacy-policy/ (last accessed September 21, 2026).

41. On or around September 1, 2026, a security journalist, Brian Krebs, reported that a dark web service called Nexus, advertised on the Russian language Exploit forum, was selling searchable access to identity documents that were linked to IDScan.Net.[6]

42. On or around September 4, 2026, IDScan confirmed that on or around September 1, 2026, IDScan experienced unauthorized access to its IT Network that resulted in more than 153 million driver's license scans, together with millions of other government-issued identification documents—including state identification cards, international travel cards, and medical and marijuana-dispensary cards—as well as the front- and back-side images and infrared and ultraviolet scans of such documents, that Plaintiffs and Class Members entrusted to Defendants, either directly or indirectly, and are now on the Dark Web for sale on a new service called "Nexus."[7]

43. Nexus claims it has been collecting these driver's license and other ID scans for over a year and that "[r]ecords are available to preview before purchase with pertinent information redacted. Customer photos are displayed if available."[8]

44. IDScan's notice published to its website indicated that it "received information indicating that certain data may have been accessed without authorization" and that "an unauthorized third party may have accessed and/or copied certain customer information stored within their accounts on the IDScan.net cloud."

---

[6] https://www.zyphe.com/resources/news/idscan-data-breach-class-actions-september-2026 (last accessed September 21, 2026).
[7] https://www.malwarebytes.com/blog/news/2026/09/dark-web-site-puts-153-milliondrivers-licenses-and-millions-more-ids-up-for-sale (last visited September 21, 2026).
[8] https://www.biometricupdate.com/202609/more-than-170m-id-scans-for-sale-on-dark-web-in-breach-allegedly-traced-to-idscan-net (last accessed September 21, 2026).

45. The Data Breach occurred, in part, because IDScan's Clients, Hertz and Planet 13, failed to adequately supervise their third-party vendors, including with whom they entrusted with the highly sensitive Private Information of their customers—here, Defendant IDScan.

46. Data belonging to IDScan's Clients, including, upon information and belief, Hertz and Planet 13, has already been published on known cybercrime forums.

47. Upon information and belief, to date, Defendants have yet to individually notify the victims of the Data Breach that their Private Information was compromised. Thus, most, if not all Class Members do not know that their Private Information has been compromised, and that they are, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

48. Defendants' failure to notify Plaintiffs and Class Members of the Breach leaves impacted individuals with no information regarding critical facts about the Data Breach, such as details of the root cause of the Breach, the vulnerabilities exploited, when the Breach occurred, how many people were affected, and the remedial measures taken by Defendants, if any.

49. Defendants failed to take necessary and reasonable precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access and exploitation.

50. Defendants failed to timely notify Plaintiffs and Class Members of the Data Breach.

51. By collecting, storing, and maintaining the Private Information of Plaintiffs and Class Members, Defendants owed a duty to Plaintiffs and Class Members to protect and safeguard their Private Information from unauthorized disclosures.

52. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendants' deficient security for customer data

caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected, unencrypted Private Information in Defendants' possession through the Data Breach.

53. Defendants had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

54. Because Defendants had a duty to protect Plaintiffs' and Class Members' Private Information, Defendants should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information. Thus, Defendants had a duty to ensure that customers' Private Information, stored within IDScan's networks and systems, was secured and protected from unauthorized disclosures to third parties.

55. Defendants could and should have prevented this Data Breach by ensuring the files and servers containing Plaintiffs' and Class Members' Private Information were properly secured and encrypted but failed to do so.

56. Because the responsibility to enforce reasonable and adequate data security measures was one shared by IDScan and its Clients, including Hertz and Planet 13, no individual Defendant can rest blame for the Data Breach solely on another Defendant. This is because Hertz and Planet 13 could have, but failed to, require IDScan, to implement proper data security safeguards.

57. Upon information and belief, neither Hertz nor Planet 13 took any measures to ensure that Plaintiffs' and Class Members' Private Information located on IDScan's systems was fully protected. This failure left IDScan's databases vulnerable to infiltration by malicious actors.

58. Defendants could have prevented the Data Breach by properly securing and encrypting the files and servers containing the Private Information of Plaintiffs and Class Members. This Data Breach could have been prevented through industry standard network segmentation and encryption of confidential information. Further, the Data Breach could have been prevented had Defendants utilized appropriate malware prevention and detection technologies.

59. Plaintiffs further believe that their Private Information and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

60. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing unauthorized access to and exploitation of Private Information.

61. Due to Defendants' inadequate security measures, failure to adequately train their employees on reasonable cybersecurity protocols, and their delayed notice to victims, Plaintiff and Class Members face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

### C. Defendants Could Have Prevented the Data Breach.

62. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

63. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

64. To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:[9]

a. An awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered;

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

d. Configure firewalls to block access to known malicious IP addresses;

e. Patch operating systems, software and firmware on devices. Consider using a centralized patch management system;

f. Set anti-virus and anti-malware programs to conduct regular scans automatically;

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary;

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used;

---

[9] How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed September 21, 2026).

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

m. Execute operating system environments or specific programs in a virtualized environment; and

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

65. To prevent and detect cyberattacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privilege credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principles of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze log-on events;

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[10]

66. Finally, Defendants could and should have implemented the following measures—also recommended by the United States government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, especially those on internet-facing devices, to limit the attack surface;

b. Regularly patch and update software and operating systems to the latest available versions. Prioritize timely patching of internet-facing servers that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities;

c. Limit the use of RDP and other remote desktop services. If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client; and/or

d. Ensure all on-premises, cloud services, mobile, and personal devices are properly configured and security features are enabled. For example, disable ports and protocols not being used for business purposes.

67. Given that Defendants stored massive amounts of Private Information for Plaintiffs and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect foreseeable cyberattacks.

### D. As a Result of Defendants' Conduct, Cybercriminals Will Misuse Plaintiffs' and Class Members' Private Information to Defraud Them.

68. Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiffs

---

[10] *Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), available at: https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/ (last accessed September 21, 2026).

and Class Members and to profit off their misfortune.

69. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[11]

70. For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, obtain medical services, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.

71. These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

72. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[12]

73. The Data Breach was targeted and financially motivated, as the only reason cybercriminals go through the trouble of hacking entities like Defendants is to steal the highly sensitive information they maintain, which can be exploited and sold for use in the kinds of criminal activity described herein.

---

[11] Facts + Statistics: Identity Theft and Cybercrime, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited September 21, 2026).

[12] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737.

74. Identity theft experts advise victims of data breaches: "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[13]

75. These risks are not speculative. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, they ***will*** use it.[14]

76. Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[15]

77. It is necessary, then, for victims of identity theft to spend countless hours and out-of-pocket expenses to repair the impact to their credit score, as well as protect themselves from future identity theft and fraud.

78. Ultimately, the full scope of the harm from this Data Breach has yet to be realized. There may be a time lag between when harm occurs and when it is discovered, and also between when Private Information is stolen and when it is used.

---

[13] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-shouldknow/.

[14] Ari Lazarus, *How fast will identity thieves use stolen info?*, Military Consumer (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stoleninfo.

[15] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737 (emphasis added).

79. By way of example, Plaintiffs and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Defendants' negligence.

80. Further, identity monitoring services only alert someone to the fact that they have already been the victim of identity theft; it does nothing to cure the fact that an individual's Private Information is compromised or prevent future identity theft.

81. As a direct and proximate result of the Data Breach, Plaintiffs and the Class have been damaged and placed at an imminent and continuing increased risk of harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and medical records for unauthorized activity for years to come.

82. Moreover, Plaintiffs and other Class Members who have already suffered identity theft (or are at an increased risk of suffering identity theft in the future) as a result of the Data Breach will be required to spend countless hours filing police reports, filling out IRS forms, completing Federal Trade Commission checklists and Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications.

83. As a direct and proximate result of the Data Breach, Plaintiffs and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

a. Actual fraud and identity theft;

b. Trespass, damage to, and/or theft of their personal property, including their Private Information;

c. Improper disclosure and theft of their Private Information;

d. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of nefarious actors;

e. Loss of privacy suffered as a result of the Data Breach;

f. Ascertainable losses reasonably expended to remedy or mitigate the effects of the Data Breach, including lost opportunities and lost wages from uncompensated time off work, out-of-pocket expenses, and the value of their time taken to protect against certainly impending future harm;

g. Ascertainable losses in the form of diminution in value of Plaintiffs' and Class Members' Private Information;

h. Increased spam, phishing and scam communications to their personal devices; and

i. Anxiety and emotional distress.

84. Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendants, is protected from further breaches through the implementation of industry standard security measures and safeguards. Defendants have shown themselves wholly incapable of protecting Plaintiffs' and Class Members' Private Information.

85. Plaintiffs and Class Members also have an interest in ensuring that their Private Information is removed from all Defendants' servers, systems, and files.

86. Given the kind of Private Information Defendants made accessible to hackers, however, Plaintiffs and the Class are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiffs and Class Members will need to have identity theft monitoring protection for the rest of their lives.

87. Plaintiffs and Class Members would not have suffered the foregoing harms, nor be at the risk of certainly impending future harms, if Defendants took the proper precautions to protect their sensitive Private Information and prevent the Data Breach.

**E. The Private Information Obtained, Used, and Maintained by Defendants is Highly Valuable to Fraudsters.**

88. It is well known among companies that store or have access to sensitive Private Information that driver's license numbers, government issued identification cards, and other personally identifying information are valuable and frequently targeted by criminals.

89. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

90. This type of Private Information is very valuable to phishers, identity thieves, cyber criminals, and other fraudsters, especially in recent years where unprecedented numbers of criminals are filing fraudulent unemployment benefit claims, and driver's license information is uniquely connected to the ability to file such claims and commit other financial fraud.

[16] 17 C.F.R. § 248.201 (2013).

91. The Private Information implicated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. By contrast, the information compromised in the Data Breach can be used to open fraudulent bank accounts and credit and debit cards or take out loans.

92. Driver's license numbers are particularly sensitive because they are long lasting and difficult to change.

93. With access to an individual's driver's license number, criminals can commit all manner of fraud, including: obtaining government benefits in the victim's name, filing fraudulent tax returns using the victim's information, or obtaining a driver's license or official identification card in the victim's name but with the thief's picture. In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name, and may even give the victim's driver's license number during an arrest, resulting in an arrest warrant being issued in the victim's name.[17]

94. Criminals and other nefarious actors can also use the driver's license when receiving a ticket or to provide to an accident victim, to replace or access account information on social media sites, to obtain a mobile phone, to dispute or approve a SIM swap, to redirect U.S. mail, to gain unauthorized access to the United States, to claim a lost or stolen passport, to use as a baseline to obtain a Commercial Driver's License, or to engage in phishing or other social engineering scams.

---

[17] Federal Trade Commission, Warning Signs of Identity Theft, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited on September 21, 2026.

95. Fraudsters often aggregate information taken from data security incidents to build profiles on individuals. These profiles combine publicly available information with information discovered in previous data security incidents and exploited vulnerabilities. There are few data security incidents that provide a comprehensive snapshot of any one individual person. Unique and persistent identifiers such as Social Security numbers, driver's license numbers, usernames, and financial account numbers (e.g., credit cards, insurance policy numbers, etc.) are critical to forging an identity. When not all information is available, the information that is stolen is used to socially engineer a victim into providing additional information so a "fullz" profile[18] can be obtained.

96. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

97. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

98. There is no legitimate or legal reason for anyone to acquire Plaintiffs' and Class Members' private information, especially their driver's license numbers.

[18] "Fullz" is slang used by threat actors and various criminals meaning "full information," a complete identity profile or set of information for an entity or individual.

99. Dark Net Markets ("DNM(s)"), or the "dark web," is a heavily encrypted part of the internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity. When malicious actors obtain ill-gotten Private Information, that information often ends up on the dark web because the malicious actors buy and sell that information for profit.[19] Why else would hackers . . . steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

100. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

101. For example, Private Information can be sold at prices ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

102. Any non-public data, especially government issued identification numbers like a driver's license or non-driver's identification number, has criminal value.[23] For example, a fake

---

[19] *Shining a Light on the Dark Web with Identity Monitoring*, Identity Force (Dec. 28, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited September 21, 2026).

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ (last accessed September 21, 2026).

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is-selling-for-on-the-dark-web/ (last accessed September 21, 2026).

[22] In the Dark, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark/ (last accessed September 21, 2026).

[23] Identity Theft Resource Center, *Can Someone Steal Your Identity From Your Driver's License?* (Feb. 19, 2021) https://www.idtheftcenter.org/can-someone-steal-your-identity-from your-drivers-license/ (last visited September 21, 2026).

U.S. citizenship kit for sale: passport, SSN, driver's license, and birth certificate, is offered on the dark web for 0.218 bitcoin (or $1,400 at the time) and a stolen/fake driver's license (by U.S. state) for $200.[24]

103. Prices can vary depending on the point in the chain – verified identities may sell for higher prices early in the chain, then for the lower prices when they reach the "flea market sites." DNMs are a downstream "flea market" for data to be sold, usually not by the original threat actor or criminal group. It is a dumping ground, usually after the data has been exploited. The value of stolen driver's license information currently has a DNM value of $1 per license. This was re-verified on March 3, 2022, accessing several DNM using a trusted identity. Social Security numbers, once considered the "gold standard" of identity fraud, are also selling for $1 per number in those same markets. This illustrates the value of driver's license information to cybercriminals and people committing identity fraud. According to popular DNMs, cyber criminals value driver's license numbers equally to Social Security numbers.

104. In some ways, driver's license numbers are even more attractive than Social Security numbers to threat actors and more dangerous to the consumer when disclosed. Unlike a Social Security number, a driver's license number is not monitored as closely, so it can potentially be used in ways that will not immediately alert the victim. Threat actors know this as well. Because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly

---

[24] Daniel Shkedi, *Heart of Darkness: Inside the Darknet Markets that Fuel Financial Cybercrime*, BioCatch,
https://web.archive.org/web/20210905231044/https://www.biocatch.com/blog/financial
cybercrime-darknet-markets (last visited September 21, 2026).

recommend immediate notice and replacement, and that identity theft protections are put in place for a minimum of 3 years. Most cyber experts, including Enterprise Knowledge Partners, recommend five years or more.

105. Blogger Gayle Sato from the national credit reporting company Experian emphasized the value of driver's license information to thieves and cautioned:

> Your driver's license may not seem like a jackpot for thieves, but it can be used to create fake driver's licenses, open accounts in your name, avoid traffic tickets or collect government benefits such as unemployment checks. Worse, if your license data has been stolen in a data breach, you may not even know it's being misused.[25]

106. In fact, according to the data privacy and cybersecurity publication CPO Magazine:

> To those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation. Tim Sadler, CEO of email security firm Tessian, points out why this is not the case and why these numbers are very much sought after by cyber criminals: ". . . It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar. . . . In other cases, a scam using these driver's license numbers could look like an email that impersonates the DMV, requesting the person verify their driver's license number, car registration or insurance information, and then inserting a malicious link or attachment into the email.[26]

107. Further, an article on TechCrunch explains that it is driver's license or non-driver's identification numbers themselves that are the critical missing link for a fraudulent unemployment

---

[25] Gayle Sato, *What Should I Do If My Driver's License Number Is Stolen?* Experian (Nov. 3, 2021) https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license number-is-stolen/ (last accessed September 21, 2026).

[26] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (April 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed September 21, 2026).

benefits application: "Many financially driven criminals target government agencies using stolen identities or data. But many U.S. states require a government ID — like a driver's license — to file for unemployment benefits. To get a driver's license number, fraudsters take public or previously breached data and exploit weaknesses in auto insurance websites to obtain a customer's driver's license number. That allows the fraudsters to obtain unemployment benefits in another person's name."[27]

108. The use of stolen driver's license numbers to obtain unemployment benefits under another person's name was confirmed by the New York State DFS on February 16, 2021 industry letter described above, which stated that they had "recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal [PI, including] websites that provide an instant quote. . . . [and that] DFS has confirmed that, at least in some cases, this stolen information has been used to submit fraudulent claims for pandemic and unemployment benefits."[28]

109. The United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that, when criminals use PI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name, this type of identity fraud can be the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime.24 The GAO Report also states that identity theft victims will face "substantial costs and inconveniences

[27] Zach Whittaker, *Geico Admits Fraudsters Stole Customers' Driver's License Numbers for Months*, TechCrunch (Apr. 19, 2021), https://techcrunch.com/2021/04/19/geico-driver-license numbersscraped/#:~:text=To%20get%20a%20driver's%20license,benefits%20in%20another%20 person's %20name (last accessed September 21, 2026).

[28] New York State Department of Financial Services, Industry Letter (Feb. 16, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert accessed September 21, 2026).

repairing damage to their credit records . . . [and their] good name."[29]

**F. Defendants Knew, or Should Have Known, of the Risk of Cyberattacks.**

110. The risk of a data breach was well known and foreseeable to Defendants. As set forth *supra*, the type of Private Information that Defendants maintained is a prime target for cybercriminals, and ransomware attacks against large companies and centralized data storage systems were widespread and escalating well before the intrusion.

111. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

112. The number of data breach victims surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[30]

113. In light of recent high profile data breaches at other industry leading companies, including National Public Data (2.9 billion records, August 2024), Ticketmaster Entertainment, LLC (560 million records, May 2024), Change Healthcare Inc. (145 million records, February 2024), Dell Technologies, Inc. (49 million records, May 2024), and AT&T Inc. (73 million records, April 2024), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

---

[29] United States Government Accountability Office, Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown (June 2007), http://www.gao.gov/assets/270/262899.pdf (last accessed September 21, 2026).

[30] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-todo/74441060007/.

114. Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[31]

115. Additionally, as companies became more dependent on computer systems to run their business,[32] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[33]

116. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if IDScan's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

117. Despite this known risk, Defendants failed to implement reasonable cybersecurity safeguards appropriate to the nature and scope of the data they collected and retained.

---

[31] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-oftargeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0- (last accessed September 21, 2026).
[32] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-riskforfinancial-stability-20220512.html (last accessed September 21, 2026).
[33] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-andbanking-firms-in-2022 (last accessed September 21, 2026).

118. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**G. Defendants Failed to Comply with FTC Guidelines.**

119. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

120. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

121. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

122. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require

---

[34] Protecting Personal Information: *A Guide for Business, Federal Trade Commission* (2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0136_protetingpersonal-information.pdf (last accessed September 21, 2026).

[35] *Id.*

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

123. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

124. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

125. Defendants failed to properly implement basic data security practices.

126. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of their customers to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

127. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of ID Scan's Clients and their customers, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of

Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**H. Defendants Failed to Comply with Industry Standards.**

128. As noted above, experts studying cyber security routinely identify businesses in possession of sensitive Private Information, particularly driver's license numbers, as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

129. Several best practices have been identified that, at a minimum, should be implemented by businesses in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multifactor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multifactor authentication.

130. Other best cybersecurity practices that are standard for businesses include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

131. Upon information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-

01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

132. Hertz and Planet 13 further failed to oversee the data security procedures and safeguards implemented by their third-party vendors entrusted with consumers' Private Information, including IDScan.

133. These foregoing frameworks are existing and applicable industry standards for businesses, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**I. Common Injuries and Damages.**

134. As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

### J. Loss of Time to Mitigate Risk of Identity Theft and Fraud.

135. In light of the recognized risk of identity theft, when a data breach occurs, and an individual reasonably believes that their Private Information was compromised, but that fact goes unconfirmed by Defendants, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

136. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

137. Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

---

[36] United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed September 21, 2026).

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

138. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[38]

**K. Diminution of Value of Private Information**

139. PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

140. Private Information can sell for as much as $363 per record according to the Infosec Institute.[39]

141. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[40]

---

[37] Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last accessed September 21, 2026).
[38] *See supra* n.34.
[39] John T. Soma, et al, Corporate Privacy Trend: *The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[40] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed September 21, 2026).

142. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[41]

143. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[42]

144. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

### L. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.

145. Given the type of targeted attack in this case, sophisticated criminal activity, the type of Private Information involved, and the fact that batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals, it is reasonable and probable that third party nefarious actors will utilize the Private Information for identity theft crimes and fraud–*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

---

[41] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed September 21, 2026).
[42] https://digi.me/what-is-digime/ (last accessed September 21, 2026).

146. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

147. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

148. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

**M. Loss of Benefit of the Bargain.**

149. Furthermore, Defendants' poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When purchasing services or goods at Hertz and Planet 13, and other of IDScan's Clients under certain terms, and providing their Private Information as part of the bargain, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the necessary data security to protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services and goods that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**N. Plaintiffs' Individual Experience.**

***Plaintiff Diamond Pugh***

150. Plaintiff Diamond Pugh is an individual residing in Greenville, North Carolina who purchased a vehicle from a Hertz dealership, an IDScan Client, this year and provided her driver's

license to be collected for verification. Upon information and belief, Plaintiff Pugh is a victim of the Data Breach.

151. Plaintiff Diamond Pugh purchased a vehicle from a Hertz Dealership earlier this year and provided her driver's license to be collected for verification as part of the transaction. Upon information and belief, Plaintiff Pugh is a victim of the Data Breach.

152. Plaintiff Pugh entrusted her Private Information to Hertz with the reasonable expectation and mutual understanding that any information shared by her with third-party vendors, including IDScan, would be secure from unauthorized access.

153. By soliciting and accepting Plaintiff Pugh's Private Information, Defendants agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

154. Plaintiff Pugh would not have provided her Private Information to Defendants had she known her Private Information would be subject to inadequate data security and left vulnerable to a cyberattack.

155. Upon information and belief, Defendants were in possession of Plaintiff Pugh's Private Information before, during, and after the Data Breach.

156. As a result, Plaintiff Pugh was injured by the Data Breach.

157. Following the Data Breach, Plaintiff Pugh was alerted by her banking institution that someone gained unauthorized access into her banking account in or around September 2026.

158. In response to the Data Breach, upon information and belief, Plaintiff Pugh made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her credit for fraudulent activity, and screening scam/phishing communications. Plaintiff estimates she has already spent at least 4 hours responding to the Data Breach.

159. Plaintiff Pugh will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of his life to protect against the certainly impending threat of future fraud and identity theft.

160. Plaintiff Pugh places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Pugh entrusted Defendants with her Private Information with the understanding that Defendants would keep his information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

161. Because of the Data Breach, Plaintiff Pugh's Private Information is in the hands of cybercriminals, as the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. The stolen ID cards have already been posted on Nexus for sale and, as such, Plaintiff Pugh and the Class are at an imminent risk of identity theft and fraud.

162. Plaintiff Pugh suffered actual injury from the exposure and theft of her Private Information, which constitutes a violation of her right to privacy.

163. Plaintiff Pugh suffered actual injury in the form of damages to and diminution in the value of her Private Information. PII is a form of intangible property—property that Defendants were required to adequately protect and safeguard against unauthorized disclosure.

164. Due to the Data Breach, Plaintiff Pugh will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendants' breach of duty to securely maintain Plaintiff's Private Information and protect it against unauthorized disclosure.

165. Plaintiff Pugh's Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

166. The Data Breach has caused Plaintiff Pugh to suffer fear, anxiety, and stress, which has been compounded by Defendants' failure to notify her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

167. Plaintiff Pugh has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

168. Plaintiff Pugh suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff Pugh's Private Information.

169. As a result of the Data Breach, Plaintiff Pugh anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

170. As a result of the Data Breach, Plaintiff Pugh is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

171. Plaintiff Pugh has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Stacey Torres***

172. Plaintiff Stacey Torres has visited a Planet 13 dispensary, an IDScan Client, multiple times this year and provided her driver's license each time to be collected for verification. Upon information and belief, Plaintiff Torres is a victim of the Data Breach.

173. Plaintiff Torres entrusted her Private Information to Planet 13 with the reasonable expectation and mutual understanding that any information shared by Planet 13 with third-party vendors, including IDScan, would be secure from unauthorized access.

174. By soliciting and accepting Plaintiff Torres's Private Information, Defendants agreed to safeguard and protect her Private Information from unauthorized access and delete it after a reasonable time.

175. Plaintiff Torres would not have provided her Private Information to Defendants had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

176. Upon information and belief, Defendants were in possession of Plaintiff Torres's Private Information before, during, and after the Data Breach.

177. As a result, Plaintiff Torres was injured by the Data Breach.

178. Following the Data Breach, Plaintiff Torres received a notable increase in spam and phishing calls, texts, and emails, some of which impersonated car insurance companies.

179. In response to the Data Breach, upon information and belief, Plaintiff Torres made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to

researching the Data Breach and screening scam/phishing communications. Plaintiff Torres estimates she has already spent at least 2 hours responding to the Data Breach.

180. Plaintiff Torres will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life to protect against the certainly impending threat of future fraud and identity theft.

181. Plaintiff Torres places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Torres entrusted Defendants with her Private Information with the understanding that Defendants would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

182. As a result of the Data Breach, Plaintiff's Private Information is in the hands of cybercriminals. The modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. The stolen ID cards have already been posted on Nexus for sale and, as such, Plaintiff Torres and the Class are at an imminent risk of identity theft and fraud.

183. Plaintiff Torres suffered actual injury from the exposure and theft of her Private Information, which constitutes a violation of her right to privacy.

184. Plaintiff Torres suffered actual injury in the form of damages to and diminution in the value of her Private Information. Private Information is a form of intangible property—property that Defendants were required to adequately protect and safeguard against unauthorized disclosure.

185. Due to the Data Breach, Plaintiff Torres will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been

published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendants' breach of duty in failing to keep Plaintiff Torres's highly sensitive Private Information secure and protected against unauthorized disclosure.

186. Plaintiff Torres's Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

187. The Data Breach has caused Plaintiff Torres to suffer annoyance and stress, which has been compounded by Defendants' failure to notify her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

188. Plaintiff Torres has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

189. Plaintiff Torres suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

190. As a result of the Data Breach, Plaintiff Torres anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

191. As a result of the Data Breach, Plaintiff Torres is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

192. Plaintiff Torres has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

193. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

194. The Class that Plaintiffs seeks to represent is defined as follows:

> **<u>Nationwide Class</u>**
> All individuals residing in the United States who Defendants identified as being among those individuals whose Private Information was accessed and/or compromised as a result of the Data Breach (the "Class").

195. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

196. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

197. Numerosity: The Members of the Class are so numerous that joinder of all Members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendants, upon information and belief, hundreds of millions of individuals were impacted by the Data Breach. The Class is identifiable within Defendants' records, and Defendants have the capacity to identify these individuals (as evidenced by its representation that individual breach notification letters are forthcoming).

198. Common questions of law and fact exist as to all Members of the Class and predominate over any questions affecting solely individual Members of the Class. Questions of law and fact common to the Class that predominate over questions which may affect individual Class Member include the following:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether and to what extent Defendants had a duty to adequately protect the Private Information of Plaintiffs and Class Members;

c. Whether Defendants breached their duty to Plaintiffs and Class Members to adequately protect their Private Information;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

e. Whether Defendants' data security systems prior to and during the Data Breach complied with the applicable data security laws and regulations;

f. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

g. Whether Defendants knew or should have known that their computer and network security systems, or the computer and network security systems of their vendors, were vulnerable to cyberattacks;

h. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach;

i. Whether Defendants breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

j. Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

k. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

l. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

m. Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct;

n. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

199. Typicality: Plaintiffs' claims are typical of those of the other Members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other Member of the Class.

200. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of

conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

201. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intends to prosecute this action vigorously.

202. Superiority and Manageability: The class action is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

203. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

204. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

205. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

206. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

207. Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

208. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether and to what extent Defendants had a duty to adequately protect the Private Information of Plaintiffs and Class Members;

c. Whether Defendants breached their duty to Plaintiffs and Class Members to adequately protect their Private Information;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

e. Whether Defendants' data security systems prior to and during the Data Breach complied with the applicable data security laws and regulations;

f. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

g. Whether Defendants knew or should have known that their computer and network security systems, or the computer and network security systems of their vendors, were vulnerable to cyberattacks;

h. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach;

i. Whether Defendants breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

j. Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

k. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

l. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

m. Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct;

n. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

## VI. CAUSES OF ACTION

### COUNT I
### Negligence and Negligence Per se
### (On Behalf of Plaintiffs and the Class)

209. Plaintiffs re-allege and incorporate by reference all preceding factual allegations as if fully set forth herein.

210. Plaintiffs and Class Members were required to submit their Private Information to Defendants to receive services or goods from IDScan's Clients.

211. In providing their Private Information, Plaintiffs and Class Members had a reasonable expectation that this information would be securely maintained and not easily accessible to or exfiltrated by others, including cybercriminals.

212. Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in safeguarding, securing, and protecting the highly sensitive and confidential data they solicit, collect, store, and maintain. This duty included a responsibility to

implement processes to detect a breach of their security systems in a reasonably expeditious manner, mitigate its damage, and give prompt notice to those affected in the event of a data breach.

213. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, and to ensure that their systems and networks, and the personnel responsible for them, adequately secured and protected the Private Information that Defendants solicit, collect, store, and maintain.

214. Defendants' duty to use reasonable data security measures includes, among other things: (a) designing, maintaining, and testing their security protocols to ensure that the Private Information of Plaintiffs and Class Members is adequately secured and protected; (b) removing or deleting sensitive data when no longer needed for authorized purposes; (c) implementing and maintaining procedures to detect and prevent improper access to and misuse of Plaintiffs' and Class Members' Private Information; and (d) overseeing the data security procedures of third party vendors in possession of Plaintiffs' and Class Members' Private Information to ensure adequacy and compliance with industry standards and applicable regulations.

215. By soliciting, accepting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendants undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

216. Defendants solicit, collect, store, and maintain the Private Information of Plaintiffs and Class Members as part of their regular business practices.

217. Defendants exercised control over the Private Information stored on their systems and networks and those of their third-party vendors; accordingly, Defendants were best positioned and most capable of preventing the harms caused by the Data Breach.

218. Plaintiffs and Class Members were not in a position to assess the data security practices Defendants purportedly used.

219. Because Plaintiffs and Class Members had no means to identify or assess Defendants' data security deficiencies, Plaintiffs and Class Members had no opportunity to safeguard their Private Information from cybercriminals.

220. Defendants therefore knew or reasonably should have known that Plaintiffs and Class Members relied on them to secure and protect their Private Information from unauthorized access and disclosure.

221. Defendants' duty of care to use reasonable and adequate security measures and to adequately train their workforces in reasonable data security protocols arose as a result of the special relationship that existed between Defendants and consumers, which is recognized by laws and regulations including but not limited to the FTC Act and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

222. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

223. Defendants' duty to use reasonable care in protecting Private Information arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

224. Plaintiff and Class Members are a well-defined, foreseeable, and probable group of persons that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

225. Plaintiffs and Class Members entrusted Defendants with their Private Information, as required by Defendants' Clients, to use Defendants' products and services and with the mutual understanding and reasonable expectation that Defendants would safeguard their Private Information.

226. Defendants' duty to use reasonable data security measures to protect and secure Plaintiffs' and Class Members' Private Information therefore arises from the special relationship that exists between Defendants and Plaintiffs and Class Members.

227. Defendants' failure to implement and maintain adequate data security created a foreseeable risk that Plaintiffs' and Class Members' Private Information would be improperly accessed or disclosed to unauthorized third parties in a data breach.

228. Defendants have, and at all relevant times had, full knowledge of the sensitivity of Plaintiffs' and Class Members' Private Information and the type of harm Plaintiffs and Class Members could and would suffer if their Private Information were compromised or wrongfully disclosed to unauthorized third parties in a data breach.

229. Defendants knew or reasonably should have known their failure to exercise due care in soliciting, collecting, storing, transmitting, and using Plaintiffs' and Class Members' Private Information would expose Plaintiffs and Class Members to a foreseeable risk of unreasonable harm.

230. Defendants had long known, or had reason to know, that their electronic record-keeping systems were prime targets for hackers.

231. Plaintiffs and Class Members were the foreseeable and probable victims of Defendants' failure to implement and maintain adequate data security practices and procedures.

232. Despite being aware of the risk of cyberattacks and the inadequacy of their own systems, Defendants failed to implement and maintain adequate data security practices, resulting in the compromise and exposure of Plaintiffs' and Class Members' Private Information in the Data Breach.

233. Defendants failed to heed industry warnings and alerts to implement adequate data security safeguards to protect Plaintiffs' and Class Members' Private Information.

234. That Plaintiffs and Class Members would be harmed, and the types of harm actually experienced by Plaintiffs following the Data Breach, were foreseeable consequences of Defendants' failure to implement adequate data security practices.

235. Defendants have admitted that Plaintiffs' and Class Members' Private Information was accessed and exfiltrated by unauthorized third parties in the Data Breach.

236. Defendants had and continue to have a duty to adequately disclose if and when Private Information stored on their systems or networks, or with their third-party vendors, is compromised, including how the data was compromised, the precise types of data that were compromised, and when. Such notice was and remains necessary to enable Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft or fraudulent misuse of their Private Information by third parties.

237. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of their and/or their third-party vendors' networks and systems;

c. Failing to ensure that their email systems had reasonable data security safeguards in place;

d. Failing to have in place reasonable and adequate mitigation policies and procedures;

e. Failing to enable and/or enforce the use of multi-factor authentication;

f. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

g. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

h. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

238. Defendants' failure to implement adequate data security measures and oversight procedures to protect Plaintiffs' and Class Members' Private Information caused Plaintiffs and Class Members to suffer injuries when their Private Information was accessed and stolen by unauthorized third parties in the Data Breach.

239. But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' Private Information would not have been compromised in the Data Breach.

240. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach as a direct and proximate result of Defendants' failure to exercise reasonable care in safeguarding that information by adopting, implementing, and maintaining appropriate data security measures.

241. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered and will suffer injuries, including, but not limited to: (a) actual fraud and identity theft; (b) the loss of the opportunity to control how their Private Information is used; (c) the compromise, publication, or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, or unauthorized use of their Private Information; (e) loss of productivity and lost opportunity costs associated with addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (f) costs associated with placing freezes on credit reports; (g) the continued risk and substantially increased risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information; (h) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; (i) the diminution in value of Plaintiffs' and Class Members' Private Information; and (j) overpayment for the services that were received without adequate data security.

242. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury or harm, including, but not limited to, loss of privacy and other economic and non-economic losses.

243. Plaintiffs and Class Members have a present and continuing interest in the security of their Private Information, which upon information and belief remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their custody.

244. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages in an amount to be proven at trial.

245. Plaintiffs and the Class are also entitled to their costs and attorneys' fees incurred in this action.

## COUNT II
**Breach of Implied Contract**
(On Behalf of Plaintiffs and the Class)

246. Plaintiffs re-allege and incorporate by reference all preceding factual allegations as if fully set forth herein.

247. Defendants acquired and maintained the Private Information of Plaintiffs and the Class that they received either directly, or which IDScan received indirectly via Hertz and Planet 13.

248. When Plaintiffs and Class Members paid money and provided their Private Information to Hertz and Planet 13, they entered into implied contracts with them and their vendors, including IDScan.

249. Plaintiffs and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

250. Defendants directly solicited, offered, and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

251. Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services and products to Plaintiffs and Class Members.

252. In accepting such information and payment for services and products, Defendants entered into implied contracts with Plaintiffs and Class Members whereby Defendants became obligated to reasonably safeguard Plaintiffs' and Class Members' Private Information.

253. In delivering their Private Information to Defendants and paying for their products and services, Plaintiffs and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

254. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

255. The implied promises include but are not limited to: (1) taking steps to ensure that any workforce members who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of their workforce members is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained workforce members; (4) designing and implementing

appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) requiring and/or enforcing multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

256. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

257. Had Defendants disclosed to Plaintiffs and Class Members that they did not have adequate data security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to Defendants.

258. Defendants recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and Class Members.

259. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendants.

260. Defendants breached the implied contracts with Plaintiffs and Class Members by failing to take reasonable and adequate measures to safeguard their Private Information as described herein.

261. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages in an amount to be proven at trial.

262. Plaintiffs and the Class are also entitled to their costs and attorneys' fees incurred in this action.

**COUNT III**
**Unjust Enrichment**
(On Behalf of Plaintiffs and the Class)

263. Plaintiffs re-allege and incorporate by reference all preceding factual allegations as if fully set forth herein.

264. Plaintiffs allege this claim in the alternative to their breach of implied contract claim.

265. Plaintiffs and Class Members conferred a benefit on Defendants by indirectly providing their valuable Private Information to Defendants. Defendants accepted and appreciated that benefit.

266. By having their Private Information conferred to Defendants, Plaintiffs and Class Members reasonably understood Defendants would be responsible for securing their Private Information from unauthorized access and disclosure.

267. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from money they make based on protecting Plaintiffs' and Class Members' Private Information.

268. Plaintiffs and Class Members paid Defendants, directly or indirectly, a certain sum of money, which was used to fund data security via contracts with Defendants.

269. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

270. Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

271. Protecting the Private Information of Plaintiffs and Class Members is integral to Defendants' businesses. Without their Private Information, Defendants would be unable to provide services comprising Defendants' core businesses.

272. Plaintiffs' and Class Members' Private Information has monetary value.

273. Plaintiffs and Class Members directly conferred a monetary benefit on Defendants by supplying their Private Information, from which Defendants derive their business, and which should have been protected with adequate data security.

274. Defendants solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information, and as such, Defendants had direct knowledge of the monetary benefits conferred upon them by Plaintiffs and the Class. Defendants profited from these transactions and used Plaintiffs' and Class Members' Private Information for business purposes.

275. Under the facts and circumstances as detailed herein, it is inequitable for Defendants to retain that benefit without payment of the value thereof.

276. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

277. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits to the detriment of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite data security.

278. Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures.

279. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injuries, including, but not limited to: (a) actual fraud and identity theft; (b) the loss of the opportunity to control how their Private Information is used; (c) the compromise, publication, or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, or unauthorized use of their Private Information; (e) loss of productivity and lost opportunity costs associated with addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (f) costs associated with placing freezes on credit reports; (g) the continued risk and substantially increased risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information; (h) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; (i) the diminution in value of Plaintiffs' and Class Members' Private Information; and (j) overpayment for the services that were received without adequate data security.

280. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages in an amount to be proven at trial.

281. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, all gains that it unjustly received.

## COUNT IV
## Declaratory and Injunctive Relief

(On Behalf of Plaintiffs and the Class)

282. Plaintiffs re-allege and incorporate by reference all preceding factual allegations as if fully set forth herein.

283. Plaintiffs bring this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

284. Plaintiffs and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

285. Defendants owed and still owe a duty of care to Plaintiffs and Class Members that require Defendants to adequately secure Plaintiffs' and Class Members' Private Information.

286. Upon information and belief, Defendants still possess Plaintiffs' and Class Members' Private Information.

287. Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class Members.

288. Since the Data Breach, Defendants have not announced any changes to their data security infrastructure, processes or procedures to fix the vulnerabilities in their computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

289. Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that led to such exposure.

290. Plaintiffs and the Class, therefore, seek a declaration (1) that Defendants' existing security measures do not comply with their contractual obligations and duties of care to provide

adequate security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures that comply with applicable data security laws and regulations, as well as industry standards.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, requests that this Court:

A. Certify this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3); appoint Plaintiffs as Class representatives; and appoint Plaintiffs' counsel as Class counsel;

B. Order appropriate compensatory, statutory, punitive, and nominal damages to Plaintiffs and Class Members under applicable law, in amounts to be determined at trial;

C. Order restitution and disgorgement of all amounts wrongfully obtained by Defendants as a result of its misconduct as described herein;

D. Order appropriate injunctive, equitable, and declaratory relief under applicable law as described above, including requiring Defendants to implement and maintain adequate data security measures and to provide appropriate identity theft protection and monitoring to Plaintiffs and Class Members;

E. Award Plaintiffs appropriate Class Representative Service Awards for their prosecution of this matter on behalf of all Class Members;

F. Award Plaintiffs and the Class pre-judgement and/or post-judgment interest as prescribed by law;

G. Award reasonable attorneys' fees and costs as permitted by law; and

H. Award other and further relief as the Court deems just and fair.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury for any and all issues in this action so triable as of right.

Dated: September 23, 2026

Respectfully submitted,

*/s/ Thomas M. Beh*
Arthus M. Murray (La. Bar No. 27694)
Stephen B. Murray, Jr. (La. Bar No. 23877)
Thomas M. Beh (La. Bar No. 24018)
MURRAY LAW FIRM
701 Poydras Street, Ste. 4250
New Orleans, LA 70139
Tel: (504) 525-8100
Fax: (504) 584-5249
amurray@murray-lawfirm.com
smurrayjr@murray-lawfirm.com
tbeh@murray-lawfirm.com

James J. Pizzirusso*
**HAUSFELD LLP**
1200 17th Street N.W., Suite 600
Washington, D.C. 20036
Tel.: (202) 540-7200
Fax: (202) 540-7201
jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
snathan@hausfeld.com

***Counsel for Plaintiffs***

* *Pro hac vice forthcoming*